[Civ. No. 22905.    Second Dist., Div. Three.    Dec. 4, 1958.]

IRVING MILLER, Appellant, v. KAISER COMMUNITY HOMES (a Corporation) et al., Respondents.

David L. Mohr and Harold W. Wax for Appellant.

Harry E. Sackett, Raoul Francoeur, Moss, Lyon & Dunn, Robert C. Nye, Henry F. Walker, James E. Mahon and Fred L. Brown, Jr., for Respondents.

WOOD (Parker), J.—Action for damages for personal injuries. Plaintiff was in an attic of a new store building, installing a burglar alarm system. A portion of the acoustical ceiling broke and plaintiff fell to the floor. The action was against the owner of the building, the contractor, the architects, the subcontractor who constructed the ceiling, and the lessee of the storeroom for whom the alarm system was being installed. In a nonjury trial, judgment was for the defendants (nonsuit was granted as to the lessee). Plaintiff appeals from the judgment.

Appellant contends that certain findings are not supported by the evidence.

Defendant Jackson Bros., as contractor, constructed a one-story building in Los Angeles for defendant Kaiser Community Homes. The building, which comprised five storerooms, was completed July 30, 1954. Six days thereafter, defendant Jacobson, as lessee, entered into possession of one of the storerooms. The storeroom was about 19 feet wide and 100 feet long. The attic of the storeroom was separated from the attics of adjoining storerooms by partitions. The distance

from the ceiling to the slightly sloping roof varied gradually from approximately 4 feet to 5 feet. It thus appears that the attic space was about 19 feet in width, 100 feet in length, and 4 feet to 5 in feet in height.

An acoustical ceiling, which was about 11 feet from the floor, extended over all the storeroom area except a small area over two closets at the back of the room. The acoustical part of the ceiling, that is, the part visible from the storeroom, was made of a lightweight material known as celotex. The celotex was in squares or sections—12 inches square and 1 inch thick.

The celotex squares were nailed to the 2½-inch underside of wood strippings (1½″ by 2½″) which extended widthwise of the room and were 12 inches apart. The ends of the strippings, which were at the side walls, were nailed to the underside of a 2-inch-wide ledge which extended along each wall. The strippings, at places other than the side walls, were nailed to the 2-inch-wide underside of wood runners (2″ by 4″) which extended lengthwise of the room and were about 4 feet apart. The runners were suspended from the rafters, at various places, by means of boards (or hangers) which were nailed to the runners and to the rafters.

At each place where the widthwise strippings were nailed to the underside of the lengthwise runners and the side walls, they were nailed with one 16-penny nail.

The nonacoustical ceilings of the two small closets, at the back of the storeroom, were about 2½ feet below the acoustical ceiling of the other part of the storeroom. In the ceiling of each closet there was a scuttle hole (18″ by 24″) which was covered by a piece of plywood.

On August 17, 1954, about two weeks after defendant Jacobson leased the storeroom, he made a contract with the Morse Signal Devices Company for the installation of a burglar alarm system. The plaintiff and another employee of that company installed the system on August 20 and 21. In making the installation, the plaintiff entered the attic through one of the scuttle holes. He installed a wire, in the attic, from a drilled hole in the acoustical ceiling at the front of the attic to a drilled hole in the rear wall. The wire was placed upon and across the wood strippings and close to and along one of the side walls.

The alarm system did not operate satisfactorily. Plaintiff testified that there was a short circuit in the system. On August 23, plaintiff went into the attic and tried to locate

the cause of the short circuit. During that search he walked on the strippings, and when he was at a place in the attic about half way from the front wall to the rear wall, and was near the side wall where the alarm wire had been installed, a portion of the ceiling at that place "gave way" and collapsed, and plaintiff fell through the opening to the floor of the store-room and sustained injuries. The portion of the ceiling which "gave way" consisted of a stripping (about 3 feet 10 inches long, 2½ inches wide, and 1½ inches thick) and eight celotex sections (which were nailed to the stripping). Plaintiff testified that immediately preceding the fall he was in a crouched position, with one foot on a stripping and his other foot on another stripping.

The stripping which "gave way" and fell was introduced in evidence (Exhibit 15). The exhibit consisted of two pieces—one piece was a corner or wedge-shaped piece of the stripping, which had split off and was about 7 inches long and, at its base, was about 1½ inches thick and about 1 inch wide. The other piece of the exhibit was the remainder of the stripping (from which the corner had split). The exhibit indicates that a nail had been driven into the underside of the stripping, at an angle, at a point about an inch from the split end; and there is no nail hole on the upper side or at that end of the stripping. Photographs of the hole which was in the ceiling, after the accident, show a nail at a place in the underside of the ledge (along the wall) where the split end of the stripping apparently had been before the accident. It appears that the portion of the nail which was exposed, or had not been driven into the ledge, was about 1½ inches in length. The other end of the stripping (Exhibit 15) shows that a nail was driven into the underside of the stripping, at an angle, at a point about half an inch from the end, and that the pointed end of the nail came out the end of the stripping about one-eighth of an inch from the upper side.

The court found that none of the defendants was negligent "in the design, construction, or maintenance" of the premises, or negligent at all; that the acoustical ceiling and strippings were not designed or built for a person to walk on; the strip-pings were constructed solely for the purpose of supporting the acoustical ceiling; plaintiff knew that it was dangerous for a person to walk on the strippings, but he chose to work and stand on the strippings and thereby assumed the risk; plaintiff was negligent and his negligence was a proximate cause of and contributed to the happening of the accident;

the owner of the premises did not know of any alleged defects in the ceiling and could not have discovered, by the use of ordinary care or any care, any alleged latent defects in the ceiling.

Appellant contends that the findings, above referred to, are not supported by the evidence. The first finding, which will be considered, is that plaintiff was negligent and his negligence was a proximate cause of and contributed to the happening of the accident. As to that finding, appellant argues to the effect that the evidence shows that he followed the customary standard of conduct of workmen who install signal systems in attics above acoustical ceilings; and that it was the custom for such workmen to walk upon the strippings. Three witnesses, who were called by plaintiff and who were qualified to testify regarding the custom of workmen in installing alarm systems, testified that it was the custom for workmen, in installing such systems above acoustical ceilings, to walk upon strippings which were of the same dimensions as those referred to herein.

Plaintiff testified that he had about 25 years' experience in installing alarm systems; he had worked in ceiling areas where the ceiling construction was similar to the construction referred to herein, and on those former occasions he had stepped on similar strippings and had not fallen through the ceiling; on Friday preceding the accident (on Monday) he had worked more than an hour in this ceiling area and had walked on the strippings; his weight was about 180 pounds; on Friday, when he first entered the attic (through one of the scuttle holes) he flashed a light around the attic area to ascertain where he could walk, where he could run the wires, and what the construction of the building was in that area; at that time, while he was near a hanger that was near the scuttle hole, he tested the strippings by putting his feet and weight on a stripping; at the time he made the test he was ready to grab the nearby hanger in case the stripping did not feel secure; he wanted to see what he was walking on—he was cautious; the stripping did not give way, and thereafter he walked on the strippings and installed the wire; he knew that the strippings were fastened "from below," but he did not know how they were fastened.

Two witnesses, who were called by defendants and who were qualified to testify regarding the custom of workmen in installing alarm systems, testified that the standard practice of workmen, in installing such systems above acoustical ceilings, was

"never to walk on strippings." It was stipulated that if defendants were to call three other witnesses, who were qualified to testify regarding the custom of workmen in installing such systems, those witnesses would testify substantially the same as the two other witnesses (called by defendants) had testified regarding such custom.

On cross-examination of one of the expert witnesses called by defendants, the witness testified to the effect that once in a great while, when it might seem necessary to put a workman's weight on the strippings, a workman would place a plank across 12 or 15 strippings so that his weight would be equally distributed over the several strippings.

It thus appears that the evidence was conflicting as to whether or not it was the custom for workmen to walk on such strippings. The court did not make a finding with reference to the custom, but it found, as above stated, that the plaintiff was negligent and his negligence proximately contributed to the happening of the accident. Even if it was a custom for workmen to walk on such strippings, the fact that plaintiff followed such custom, or the fact that he did not follow such custom, would not be determinative as to whether he was or was not negligent. ▮ In *Pauly* v. *King*, 44 Cal.2d 649 [284 P.2d 487], it was said at page 655: "'Failure to observe custom may be evidence of negligence, but the standard is not fixed by custom. The standard is always due care. The presence or absence of custom does not alter that standard. Custom may assist in the determination of what constitutes due care. What others do is some evidence of what should be done, but custom is never a substitute for due care.'" In the present case the evidence as to custom was to be considered with all the other evidence in determining whether plaintiff was negligent. The questions of negligence and contributory negligence were questions of fact for the determination of the trial judge. ▮ There was testimony of five expert witnesses (on behalf of defendants) that it was not the custom for workmen to walk on strippings. The "cautious" action of plaintiff in testing the security of the strippings before he walked on them indicates that he was apprehensive regarding his safety if he walked on the strippings. He knew that the strippings were not resting on top of the runners or the wall ledgers. He testified that he knew the strippings were fastened "from below" (the runners and ledgers) but he did not know how they were fastened. There was evidence to the effect that, on occasions, when it seemed necessary for a workman to put

his weight on the strippings, the workman customarily would place a plank across strippings so that his weight would be distributed on several strippings. Plaintiff did not use a plank in that manner but he stepped from one stripping to another, placing his weight (180 pounds) on single strippings. Just prior to the time the ceiling broke, plaintiff was not stepping from one stripping to another, but he was in a crouched position with his weight on one or two strippings. The evidence was sufficient to support the finding, above referred to, that plaintiff's negligence proximately contributed to the happening of the accident.

██ Appellant also contends that other findings (regarding assumption of risk, and the design) are not supported by the evidence. It is not necessary to determine such further contentions for the reason that the finding regarding plaintiff's contributory negligence supports the judgment. ██ In *Logan* v. *Forster*, 114 Cal.App.2d 587 [250 P.2d 730], it was said at page 602: "If one finding, sustained by sufficient evidence, will support the trial court's judgment, as to the findings before referred to in the present case, an appellate court will presume that the judgment was predicated on such finding, and questions relative to other findings become immaterial upon appeal and may be disregarded."

██ Appellant also contends that the court erred in sustaining objections to his questions concerning the "negligent design" of the ceiling. The complaint alleged that defendants negligently and carelessly made and constructed the ceiling. Appellant states in his brief that at the time the complaint was drawn there was a strong possibility that he might have to rely on the doctrine of res ipsa loquitur, and he was bound at that time to allege negligence in the most general terms. At the time of making the ruling, the judge said that he was inclined to think that where the plaintiff has pinpointed construction and maintenance, as distinguished from design, and has said that that is the negligence, he necessarily elects to stand on "the specific [allegation] rather than the general." Plaintiff's counsel said, "That was the intention here." The court did not err in sustaining the objection. Even if some of the defendants were negligent in designing the ceiling, the contributory negligence of the plaintiff, as found by the court, would preclude plaintiff from recovering a judgment in his favor.

██ Appellant also contends that the court erred in denying his motion to amend the complaint to allege that defend-

ants were negligent in designing the ceiling. Whether the motion should be granted was a matter within the discretion of the trial court. The trial had proceeded four days when the motion was made. It does not appear that the court abused its discretion.

Appellant contends further that the court erred in refusing to receive in evidence a certified copy of two sections of the Los Angeles Building Code. One of the sections stated in part that the purpose of the building code was to safeguard persons and property by regulating the design and construction of buildings to be erected within the city. The other section provided in part: "(b) Nailed Joints. 1. Every nail shall penetrate the member connected to a distance of at least equal to one half the nail length. . . . 3. Every joint required to be nailed shall have at least two nails. . . ." The court, in ruling upon the objection to the introduction of the code sections in evidence, said: "I am going to overrule the defendants' objection as to all grounds, except that of the foundation. I am not satisfied that the nailed joints here involved in this litigation fall within or are governed by the provisions of Section 91.2508 of the Los Angeles Building Code, certified copy of which is tendered in evidence. You certainly have leave to establish your foundation in any manner you wish." There was no testimony that the connection or contact between the strippings and the runners was a joint within the meaning of the section. It would serve no useful purpose herein to determine the question as to the admissibility of the sections, for the reason that even if there were negligence on the part of some of the defendants in nailing the strippings, the contributory negligence of plaintiff, as found by the court, would preclude him from recovering a judgment in his favor.

The judgment is affirmed.

Shinn, P. J., and Vallée, J., concurred.